BEN HAR HOLDING CORPORATION, Plaintiff, *v.* FARNHAM B. FOX, Defendant.

Municipal Court of New York, Borough of Queens, Sixth District, April 14, 1933.

*George Rubenfeld,* for the plaintiff.

*Bowe & Kriser* [*David Kriser* of counsel], for the defendant.

PETTE, J. This is an action to recover the sum of $135 as rent for an apartment on the first floor of the building No. 215–37 Lawrence boulevard, Bayside, N. Y., for the months of October, November and December, 1932, under a written lease entered into between the parties on December 31, 1931.

Upon the trial the defendant stipulated that the only defense to be passed upon by the court was that of constructive eviction. Therefore, the initial question of whether the defendant is liable for the October rent is resolved against him, since he admits that he

occupied the premises until October twenty-fifth, the rent having become due on October first.

In support of said defense, the defendant contends that he was compelled to move because the apartment was infested with crickets; that they caused annoyance and discomfort to him and his family. His wife testified that she became ill and nervous by reason of the presence of these insects, which were described by her and other witnesses as being black, green and silver in color, about an inch and a half long, and that they caused sleeplessness. One witness testified that she saw them crawling up the wall, and that they resembled beetles. It was testified that several of these insects were found in defendant's bed.

The landlord submitted, in rebuttal, that although complaints had been made of the existence of insects, an investigation by its exterminator had revealed the presence of only three dead crickets. An interesting letter sent by the landlord to the tenant, as far as material, reads as follows: " You mention in your letter the existence of a plague of insects which has become unbearable. The insects you complain of are crickets and no doubt found in most of the houses and apartments in Bayside. They are harmless and many people enjoy their chirping. In fact, there was a poem dedicated to the Cricket on the Hearth, and in China they put them in cages to hear them sing. The little creatures enter the house through the doors as people enter so that if they are unwelcome they are removed by the tenant, which also removes the dust tracked in on one's feet. However, as you know we had the exterminator attend to your apartment and as a result you found three dead crickets so we thought that ended the matter. If it is your desire to give up the apartment on some other account you should not blame it on the crickets or call them a plague of insects."

It is well settled that eviction discharges the duty to pay rent. (*Sully* v. *Schmitt*, 147 N. Y. 248.) The law of constructive eviction is of comparatively modern origin. The early common law did not recognize constructive eviction, actual eviction being necessary to relieve the tenant from the liability for rent. (*Hunt* v. *Cope*, 1 Cowp. 242; 98 Eng. Rep. 1065 [1775].) The cases seem confused as to what facts may constitute a constructive eviction. However, it is generally held that if there be (a) an injurious interference with the tenant's possession; (b) a substantial deprivation of the tenant's beneficial use of the premises or some part thereof, or (c) a material impairment of the tenant's beneficial enjoyment of the premises so that he is compelled to vacate, then constructive eviction is thereby constituted. But the underlying, essential element which must be present is an affirmative act or omission on the

part of the landlord. If the landlord is under any duty in regard to the leased premises, the violation of which amounts to a tort, and a breach of this duty makes the premises untenantable, there will be an eviction. (*Daly* v. *Wise*, 132 N. Y. 306; *Madden* v. *Bullock*, 115 N. Y. Supp. 723.)

In this situation, it becomes the duty of the court to determine whether the presence of crickets amounted to a constructive eviction. It has been held that "An eviction depends upon the materiality of the deprivation. If trifling, and producing no substantial discomfort or serious inconvenience, it will be disregarded and will not afford cause for the termination of the relation of landlord and tenant." (*Seaboard Realty Co.* v. *Fuller*, 33 Misc. Rep. 109, at p. 110.)

That rule makes it a question of fact as to whether the deprivation be material. Cases there are in which the peculiar facts were held to justify abandonment. Thus, in *Streep* v. *Simpson* (80 Misc. 666) the Appellate Term, Second Department, ruled that bedbugs, which infested every nook and corner of the apartment, due to conditions in another part of the building over which the tenant had no control, despite efforts to exterminate them, and which " continued to increase, befouling the walls, emitting odors, and biting the occupants, and exhibiting in their migration a tendency to abide in defendant's flat," amounted to an insufferable nuisance, not attributable to the tenant, causing discomfort and distress.

A similar situation also existed in *Hancock Construction Co.* v. *Bassinger* (198 N. Y. Supp. 614, not officially reported), where the Appellate Term, First Department, held that bedbugs which came from behind the moulding on the wall, out of the cracks, and from behind the wooden panels, so numerous that they got into defendant's clothes and habitually accompanied him to his business office downtown where " an inquisitive bedbug would come forth from some secret place, much to defendant's embarrassment; " and that '' after each visit of the exterminators, there would be relief for a day of two, but then the reenforced army would come forth again with renewed vigor, and the defendant and his family would spend sleepless nights as they were unable to get a resting place in the apartment where solitude and sleep could be enjoyed," was such an aggravated condition, " evidently the result of negligence " on the part of the landlord in not properly caring for its property, and subjected the defendant to such a " disgusting experience of being overwhelmed by an army of vermin," as to make out a constructive eviction. The decision in favor of the defendant in that case rested upon the proposition that the defendant could not pull

down the walls of the apartment to destroy the vermin. However, the court recognized that the defense of constructive eviction will not avail where the premises may be rid of the nuisance by some attention on the part of the tenant. The court said: " It may well be that the presence of bugs and ants in an apartment, can, within certain limits, be controlled and remedied by the tenant, and which would not warrant the claim that the condition amounted to a constructive eviction, as was held in the case of *Jacobs* v. *Morand* (59 Misc. Rep. 200)." (*Hancock Construction Co.* v. *Bassinger, supra*.)

Indeed, in the *Jacobs* v. *Morand* case, referred to in the above quotation, the Appellate Term, First Department, held that the presence of the water bugs and bedbugs did not constitute eviction, citing some earlier cases. The court refers to *Vanderbilt* v. *Persse* (3 E. D. Smith, 428), in which a bad smell in the pantry, the kitchen being too hot with the stove in it, bad smells from the front window, a stagnant pond of water near the place, bad smell from fish, and vermin in the bedrooms, were held merely to be " matters that might have given some trouble to eradicate, but none of them can be held sufficient to relieve the tenant from his liability, or to come within the rule that defines an eviction." And, too, in *Pomeroy* v. *Tyler* (9 N. Y. St. Repr. 514) Chief Justice McADAM wrote "that because the rooms occupied by him [the defendant] were overrun with vermin, to wit: bedbugs, cockroaches, croton water bugs, and red ants, making it inconvenient to inhabit the premises and render them untenantable, * * * did not constitute a constructive eviction of the tenant." Judge McADAM said that the inconvenience was " one to which all more or less are subjected at times; but which, with ordinary skill and attention, may be abated by the tenant."

To further illustrate that constructive eviction is established only in cases where the intolerable condition is neither caused nor can be remedied by the tenant, reference is made to the case of *Madden* v. *Bullock* (*supra*) in which the loathsome stench of dead and putrescent rats in the walls and under the floors, which was made worse by the use of chloride of lime, was held to be a sufficient cause for abandonment of the premises, upon the ground that the " defendant [tenant] was powerless to abate this peril to health." And in *Barnard Realty Co.* v. *Bonwit* (155 App. Div. 182), in which a " disturbance caused by the nightly meetings and performances of rats in the walls and ceilings, coupled with a most offensive odor which increased until the place became untenantable," a constructive eviction was likewise held to have taken place.

In the case at bar the court is merely concerned with the proposition of whether a few crickets in the tenant's premises, under the circumstances testified to, may be legally classified among the various types of creatures known to be noxious or mischievous, and commonly referred to as vermin or pests, the presence of which will, in law, constitute a constructive eviction.

The solution of the problem requires an examination which leads into the fields of entomology where nature asserts its majesty, and man must bow in reverence. A cricket is defined as a " Saltatorial Gryllid Orthopterous insect," of which there are several species, the most common in this region being the house cricket (gryllus domesticus). Whatever the variety, the cricket's most conspicuous means of locomotion is an habitual leaping, which at times is so frequent as to suggest dancing. Hence, the term " saltatorial."

Webster's Dictionary defines vermin as including " noxious little animals, or insects, collectively, as squirrels, rats, mice, worms, flies, bugs, etc."

The term " bug " would seem to be the nearest reference to a particular type of insect. Is a cricket a bug? The same lexicographer has this to say: " According to present popular usage in England, and among housekeepers in America, bug, when not joined with some qualifying word, is used specifically for bedbug. As a general term it is used very loosely in America."

That a bedbug, " a wingless, bloodsucking insect especially infesting beds," is malodorous and repulsive is within common observation, and, therefore, may easily be qualified as one of the vermin class. Whether an assemblage of cockroaches, which are bugs performing and scurrying about the household, constitutes a nuisance is not in point. But it is difficult to consign a cricket to such lowly levels, even though there is testimony here that some were found in defendant's bed. We are dealing with crickets as a particular genus of the lower animal kingdom, of the order orthoptera, which includes grasshoppers, cockroaches, locusts and allied genera, and we may not, therefore, pause to take cognizance of a mere few of some species of the genus, whose individual characteristics or propensities may be, quite distinct and independent from the rest of the species, to hibernate in bed on a par with a human being, especially since the testimony fails to show the particular circumstances under which the creatures came to be in the bed, unless it be due to the " retiring " disposition spoken of in Chambers' Encyclopedia.

Assuming that the cricket may be tersely described as a bug, the question still remains whether he is noxious, and hence, one of

the vermin class. The defendant's contention that the creatures were "a plague of insects" may readily be disposed of as not sustained by the facts. A plague, which is a calamity, may be said to exist in cases where a multitude of insects, such as the locust species, unexpectedly invade a territory, destroying the crops and causing untold suffering. But crickets in a house, in a rural community, are nothing out of the ordinary.

While a cricket is technically an insect and a bug, it would appear from a study of his life that, instead of being obnoxious, he is an intellectual little fellow, with certain attainments of refinement and an indefatigable musician par excellence. Besides the great leaping powers common to both male and female, the male of the species is provided with a stridulating apparatus by which he produces the chirping sound which may be heard nightly in the open fields, and in country districts, in the neighborhood of the fireplace, since it is particularly fond of warmth. Chambers' Encyclopedia says that the cricket " hides in nooks and crevices, and loves the neighborhood of the fire, especially in winter. Its merry note has become associated with ideas of domesticity (as in Dickens' *Cricket on the Hearth*). * * * It remains quiet during the day, but hunts about actively at night for crumbs and other scraps. * * * is well known for the sound by means of which the male captivates his mate. The loudest noise made by the cricket is probably the Sicilian species (gryllus megalocaphalus), which is said to make itself heard ' at a distance of a mile.' " We may be thankful that such a species does not inhabit these parts.

The sound is produced by a file-like ledge on one wing which is rubbed on the rough upper surface of the nervures of the chitinous cover of the other wing. This ledge is used instinctively as a sort of manubrium for the emission of sound, much after the fashion in which the violinist applies his bow. Undoubtedly, then, here is a naturalistic musician, endowed with an instrumentation than which there appears to be no equal for endurance and fortitude.

That the resonant sound produced, whether it be called chirping, stridulation or singing, is music nevertheless, and that it has received its classical definition and allocation, is attested by its frequent mention in poetry and literature. Clarence Weed, a naturalist and entomologist, speaking of the observation of crickets in a glass jar, etc., says: " If you watch them carefully, you will see that they sing with the fiddles on their wings. Our American crickets are by no means lacking in interest. They are the most abundant and familiar of our insect musicians, and they give the warm evenings of late summer and early autumn a special charm which would be

greatly missed without their notes. They are the easiest insects to observe in musical action, for they can be kept in confinement where they will continue singing with apparently as much freedom as when in the open field."

At this point, it is proper to note that the practice of keeping crickets in vivariums is widespread in Japan, where, from time to time, the government has had to pass regulations controlling their sale and propagation. It appears that in that country, as well as in China, the crickets are prized according to the quality of their song.

Weed goes on to say that the songs are " among the most pleasing and characteristic sounds of late summer and early autumn. This insect music is undoubtedly primarily for the purpose of attracting the female, but it also seems soon to become an instinctive habit, kept up hour after hour and night after night throughout weeks of adult life."

The evidence at bar shows that the crickets were black, green and silvery. The silvery cricket was probably one of the four or five species of tree crickets of whose delectable notes Weed makes special mention as follows: " Listeners who study them carefully find that there is a rhythmic quality in the notes of the snowy tree cricket which varies from the more continuous tones of the striped tree cricket. The song of the former has well been described as ' a series of clear, high-pitched trills, rhythmically repeated for an indefinite length of time.' The quality is that of a clear whistle, and has best been described by the word ' re-treat.' The pitch varies somewhat with the temperature, but on an ordinary evening, it is about C, two octaves above middle C, or on a warm evening, it may reach as high as D."

As demonstrating the intellectual capacity of these creatures, we see that they possess the power of organization for the purpose of producing harmonic or symphonic results. Continuing from Weed: " So far as known, these crickets are the only insects that have the instinct to organize themselves into orchestras. It has been noted by many observers that all the crickets in a given patch of weeds or raspberries are likely to be performing upon their instruments with such distinct regularity of time that all sound in unison in what may fairly be called an orchestral concert."

Burrows characterizes the crickets' merry " re-treat " as " a rhythmic beat;" Thoreau says it is a " slumberous breathing;" Hawthorne terms it an " audible silence," and adds: " If moonlight could be heard, it would sound like that." The " World-Book " says that this little insect has " become associated with the crackling

fire and the steaming kettle," and reference is made to Cowper's description of the tune as:

> " Sounds inharmonious in themselves and harsh,
>     Yet, heard in scenes where peace forever reigns,
>   And only there please highly for their sake."

Dickens, in his beautiful Christmas tale, " The Cricket on the Hearth," has immortalized the chirping of these creatures as a symbol of peace and contentment. Indeed, in that story, the cricket sings only when things are running smoothly, but in times of sadness and trouble it is silent.

It is singular that a musician should complain about another musician. The tenant with his tuba, which is similar to the ancient bombardon, is able, in an artificial band or orchestra, to dispense all the music within its compass, nearly four octaves, including all the chromatic tones. The cricket, with his musical armature, is capable of emitting his intermittent notes, though mainly for selfish purposes in love-making, yet in obedience to its natural instinct. Bates observes that the ground cricket (gryllus campestris) after burrowing for his home, sits at the mouth of his hole in the evenings " noisily stridulating until the female approaches, when the louder notes are succeeded by a more subdued tone, whilst the successful musician caresses with his antennae the mate he has won."

This is typical of the romance of all forms of life. The cricket is thus revealed to be not only a histrionic performer and a singer, but a romantic lover as well. His strains, by whatever nomenclature known, may be really likened to the familiar crooning so endearing and entertaining to the gentle sex of the human family, and his unique adaptability for orchestral renditions, as Weed remarks, makes of him a member of the musical fraternity, and so a confrère of defendant. That there was, in this case, what may be termed a unilateral affinity between the crickets and the tuba player is demonstrated by the fact that not only were they attracted by the tuba's deep notes, but they wished to be his personal companions, each a concomitant adjunct in the production of orchestral melody.

Dickens' prototype cricket lay still in times of adversity. Here there was trouble indeed. The tuba player's non-reciprocating attitude towards the crickets' attachment must have caused dismay among them, and if the hosts would leave the premises it would mean misery for them. A loss of habitation and appurtenances in these days is a disastrous event, and three of the crickets must have become so melancholy that, to use a bit of criminal phraseology, they suffered pains of which they languished, and languishing did live until of said pains they did die.

Upon the above considerations, I am constrained to reject defendant's theory of constructive eviction, the facts being quite unsubstantial.

The crickets gained access to the premises through no act or omission on the landlord's part. The court must take care lest a situation such as here presented, which in rural communities can easily involve bullfrogs, crickets, locusts, grasshoppers, katydids, *et similia,* may, in the words of Judge MACLEAN (dissenting), " become a convenient precedent throughout the wide municipality for tenants who would have themselves evicted by incidents easy for them to bring about and impossible for the landlord to forefend." (*Madden* v. *Bullock,* 115 N. Y. Supp. 723.)

Judgment will be entered for the plaintiff for the full amount demanded.